**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | |
|---|---|
| DANIEL LEE LAIRD,<br><br>      Plaintiff,<br><br>  v.<br><br>MICHAEL SIBBETT et al.,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:06-CV-671 TS<br><br>District Judge Ted Stewart |

Plaintiff, Daniel Lee Laird, an inmate at the Utah State Prison, filed this pro se civil rights action under 42 U.S.C. § 1983. *See* 42 U.S.C.A. § 1983 (West 2010). Plaintiff was allowed to proceed *in forma pauperis* under 28 U.S.C. § 1915(b). *See* 28 *id.* 1915(b). Before the court are Defendants' and Plaintiff's respective motions for summary judgment.

**ANALYSIS**

**I. Background**

Plaintiff's Complaint names as defendants the Utah Board of Pardons and Parole ("Parole Board" or "Board") and each member of the Parole Board (as constituted when the case was filed) in both their individual and official capacities. The Complaint seeks declaratory and injunctive relief as well as compensatory and

punitive damages based on the Board's alleged religious discrimination. Specifically, Plaintiff alleges that the Board violated his rights under the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), *see* 42 U.S.C.A. § 2000cc-1 (West 2010), by impermissibly considering his religious beliefs and desire to become a minister during his parole proceedings. Plaintiff also generally alleges that the Board routinely considers inmates' religious beliefs and affiliations and gives preferential treatment to members of The Church of Jesus Christ of Latter-day Saints ("LDS Church").

On October 21, 2008, the United States Marshals Service completed service of Plaintiff's Complaint upon Defendants. After filing their Answer Defendants were directed to prepare a *Martinez* Report addressing Plaintiff's claims.[1] Defendants' *Martinez* Report (Dkt. nos. 75 & 83) was filed on February 25, 2010, and includes numerous exhibits including relevant Parole Board records, Plaintiff's sex offender treatment records, and the sworn affidavits of Defendants.[2] No further discovery was

---

[1] In *Martinez v. Aaron*, 570 F.2d 317 (10th Cir. 1978), the Tenth Circuit approved the practice of district courts ordering corrections officials to prepare a report to be included with the pleadings in cases where a prisoner alleges a constitutional violation by such officials.

[2] Due to their sensitive nature the Exhibits were filed separately under seal with leave of the court.

conducted.  Defendants now move for summary judgment based on the evidence in the *Martinez* Report.  Plaintiff has also moved for summary judgment but has not presented any additional evidence besides his own affidavit (Dkt no. 68), which was filed prior to the *Martinez* Report.

## II. Facts

Plaintiff is a repeat sex offender who has committed many offenses against children.  All of Plaintiff's victims were people over whom he held a position of trust, including his step-children.  Plaintiff was first convicted of a felony sex crime in 1981.  Plaintiff was released on parole that same year and was discharged in 1983.  In 1991 Plaintiff was convicted of two counts of Sexual Abuse of a Child and was sentenced to an indeterminate prison term of one to fifteen years.  Plaintiff was paroled in June of 1999 but his parole was revoked one year later after he was observed viewing incest-themed pornographic material at work.  Plaintiff was again paroled in July of 2001, however, his parole was revoked in 2002 when he was charged with Attempted Forcible Sexual Abuse against his adult step-daughter.  Plaintiff pled guilty and was sentenced to a prison term of zero to five years, to run consecutive to his previous prison term.  Plaintiff's combined prison term is currently set to expire on April 12, 2011.

Following his return to prison in 2002, Plaintiff was placed in the Sex Offender Treatment Progam (SOTP). His primary therapist was Heather Green. As part of the SOTP curriculum Plaintiff was required to write a "Risk Free Relapse Prevention Plan" in which he stated that his goal following release was to become a Christian minister. Plaintiff alleges that Green challenged this goal, stating that it was "grandiose" and "super-optimistic," and told Plaintiff to rewrite his plan to include a more appropriate goal. According to Plaintiff, Green stated that if Plaintiff wanted to become a minister he could, however, he shouldn't put that in his paperwork as part of his plan.

In 2004 Plaintiff was discharged from SOTP for poor performance and conflicts with staff. According to the SOTP Discharge Summary prepared on July 13, 2004, Plaintiff had "approached treatment in a highly deceptive manner," "blamed his sexual re-offense on past treatment providers," and "attempted to divert his sexual deviancy to irrelevant issues." In addition to the disagreement with Green, the Discharge Summary also noted conflicts with other staff including Plaintiff's individual therapist, Dr. Harold Blakelock, and his anger management class leader, Lane Cannon. The Discharge Summary noted that based upon

receiving a score of +4 on the Static-99 test,[3] Plaintiff was classified as being at a "Medium-High Risk" of recidivism (a 36% rate of sexual re-offense within 15 years).  The Discharge Summary was signed by seven mental health professionals who unanimously agreed with the report and recommendation.  The panel concluded: "Due to Mr. Laird's poor performance in therapy, which has resulted in his removal, and previous sexual offenses which he has been incarcerated for, it is strongly recommended that he not be considered for an early release until he has re-entered sex offender treatment and demonstrated satisfactory progress."

In July of 2005 Plaintiff appeared before Parole Board member Jesse Gallegos for a Parole Rehearing.  In accordance with Board procedures, a single member of the Board conducts the hearing and then prepares a report for consideration by the full Board.  Prior to his hearing Plaintiff sent letters to the Board discussing his religious beliefs and explaining some of the problems he experienced in SOTP.  During his Rehearing, Plaintiff repeatedly brought up his religious beliefs, his conflict with

_____

[3]  According to its official web site, www.static99.org,: "The Static-99 is a ten item actuarial assessment instrument created by R. Karl Hanson, Ph.D. and David Thornton, Ph.D. for use with adult male sexual offenders who are at lest 18 years of age at time of release to community.  It is the most widely used sex offender risk assessment instrument in the world, and is extensively used in the United States, Canada, the United Kingdom, Australia, and many European nations."

Green regarding his plan to become a minister, and his problems in SOTP. Plaintiff stated that he was willing to re-enter SOTP only if they accepted his religious viewpoints and that he would rather find a faith-based treatment program more to his liking. Plaintiff explained that "[I]f I have to compromise my faith to-- in order to make it through the program . . . If I have to lie about my desires for the ministry, my desires to follow the gospel in order to make it through the program, that's not right." Plaintiff went on to say that "[I]f it comes to a point where I have to choose between my faith and my beliefs and a-- their secular therapeutic means, then I'll just go ahead and [serve out my sentence]." In order to be sure he understood Plaintiff correctly, Gallegos tried to restate Plaintiff's position, and then discussed it with Plaintiff. Gallegos then explained to Plaintiff that his insistence upon pursuing a faith-based treatment option rather than SOTP, "may have an unreasonable effect on [Plaintiff] getting a parole date." During the hearing Plaintiff also stated that he had arranged for a job and housing through a ministry in California following his parole. Gallegos inquired, "With what church is this?" Plaintiff responded, "The Universal Life Church . . . ." At the close of the hearing Gallegos stated, "[W]hat I'm gonna be reporting to the Board is that your religious convictions are

such that if they--if those convictions call for a compromise on your part, that you're willing to fully expire your sentence."

On July 13, 2005, the Board, through its then-chairman Michael R. Sibbett, issued its Rehearing Decision ("2005 Rehearing Decision") stating that Plaintiff should remain in prison until the expiration of his sentence. However, the Board also stated, "The Board of Pardons will reconsider this case if Mr. Laird enters and makes appropriate progress in Sex Offender Therapy." At the time of its 2005 Rehearing Decision, in addition to Gallegos' report, the Board also had access to a variety of materials, including: (1) a Rehearing Report prepared by the Utah Department of Corrections Deputy Warden Colleen Gabbitas, which contained Mr. Laird's hearing application explaining his views; (2) a Board of Pardons Hearing Worksheet; (3) Plaintiff's correspondence to the Board; and, (4) a checklist titled Rational For Decision On 7/7/05 For Rehearing, which was prepared by Mr. Gallegos and identified thirteen aggravating factors and only three mitigating factors in Plaintiff's case.

Following the 2005 Rehearing Decision, Plaintiff wrote multiple letters to the Board reiterating his refusal to accept parole but stating his desire to be released early without any conditions. After failing to find a suitable faith-based treatment program Plaintiff reapplied to SOTP in 2007 and was

readmitted in January of 2008.  Only one member of Plaintiff's
previous treatment team, Dr. Blakelock, was reassigned to
Plaintiffs case.  Upon his readmission Plaintiff was again tested
using the Static-99 test and scored a +6, which raised his
likelihood of recidivism from "medium-high" to "high" (52% chance
of recidivism within 15 years).  On March 19, 2009, Plaintiff
filed a petition for a Special Attention Hearing before the
Parole Board based on his readmission to SOTP.  Three months
later Plaintiff was again discharged from SOTP for poor
performance.  On February 23, 2010, the Board conducted a Special
Attention Review of Plaintiff's case and determined there would
be no change to its 2005 Rehearing Decision.

### III. Summary Judgement Standard

Summary judgment is appropriate "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law."  Fed. R. Civ. P.
56(c).  "One of the principal purposes of the summary judgment
rule is to isolate and dispose of factually unsupported claims or
defenses . . . ."  *Cellotex v. Catrett*, 477 U.S. 317, 324, 106 S.
Ct. 2548, 2553 (1986).  Thus, Rule 56(a) of the Federal Rules of
Civil Procedure allows a party to move "with or without

8

supporting affidavits for a summary judgment in the party's favor upon all or any part of [a claim]." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Cellotex*, 477 U.S. at 325. This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp 1100, 1102 (D. Utah 1998).

Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* Federal Rule of Civil Procedure 56(e) requires a nonmovant "that would bear the burden of persuasion at trial" to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998). The specific facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992). Mere allegations and

references to the pleadings will not suffice.  However, the Court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion."  *Lopez v. LeMaster*, 172 F.3d 756, 759 (10ᵗʰ Cir. 1999).

## IV. Defendants' Motion for Summary Judgment

Plaintiff contends that his right to freely exercise his religion has been violated on two grounds:[4]  First, that he was terminated from SOTP in 2004 solely because he insisted on becoming a Christian minister following his release from prison; and, second, that the Board denied him early release based on improper religious considerations, as demonstrated by Gallegos' discussion of religion during the 2005 Parole Rehearing. Plaintiff asserts that Defendants' actions violated his rights under both the First Amendment and RLUIPA.  After setting forth the applicable legal standards the court will address each of these claims in turn.

---

[4]  Plaintiff's Complaint also vaguely asserts that the Board impermissibly considers inmates' religious affiliations and favors members of LDS Church, however, Plaintiff has never properly presented this claim, nor has he presented any evidence to support it.  Moreover, the court notes that a similar, but much more detailed, claim was raised in a contemporaneous case filed in this court in 2004 by numerous Utah State Prison inmates.  *See Granguillhome v. Utah Bd. of Pardons*, Case no. 2:04-CV-260 TC (D. Utah, filed Mar. 26, 2004).  On December 8, 2006, the court granted summary judgment to defendants in that case finding no evidence to support a pattern of discrimination by the Board.  *Id.* docket no. 93, 2006 WL 3672901.

## A. Legal Standards

### i. First Amendment

Under the Free Exercise Clause of the First Amendment, which applies to the States by incorporation into the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 903 (1940), "government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma." *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 (1990) (internal citations omitted). It is well-settled that "[i]nmates . . . retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400 (1987). However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974). Thus, the Supreme Court has held that impositions on inmates' free exercise rights are valid so long as they are "rationally related to legitimate penological

interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987).

According to *Turner*, to show a constitutional violation under the Free Exercise Clause a prisoner-plaintiff must satisfy a two-step inquiry. First, the prisoner-plaintiff must show that a correctional policy "substantially burdened . . . sincerely-held religious beliefs." *Boles v. Neet*, 486 F.3d 1177, 1182 (10th Cir. 2007). Second, correctional officials-defendants may "identif[y] the legitimate penological interests that justif[ied] the impinging conduct." *Boles*, 486 F.3d at 1182. At that point, courts balance the factors set forth in *Turner*, to determine the reasonableness of the regulation. The *Turner* factors include:

> (1) whether a rational connection exists between the prison policy regulation and a legitimate governmental interest advanced as its justification; (2) whether alternative means of exercising the right are available notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether ready, easy-to-implement alternatives exist that would accommodate the prisoner's rights.

*See Turner*, 482 U.S. 89-91, 107 S. Ct. 2254.

### ii. RLUIPA

In 2000, Congress passed the Religious Land Use and Institutionalized Persons Act (RLUIPA). *See* 42 U.S.C.A. § 2000cc-1 (West 2010). RLUIPA provides that "no [state or local] government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the government shows that the burden furthers "a compelling governmental interest" and does so by "the least restrictive means." § 2000cc-1(a)(1)-(2). The Act, which applies to all persons confined to an institution that receives "Federal financial assistance," § 2000cc-1(b)(1), defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc-5(7)(A). The Tenth Circuit has held that RLUIPA applies in the prison context. *See Ahmad v. Furlong*, 435 F.3d 1196 (10th Cir. 2006).

Under the RLUIPA framework, the plaintiff bears the initial burden of "produc[ing] prima facie evidence to support a claim alleging a violation of the Free Exercise Clause . . . ." § 2000cc-2(b). Once the plaintiff satisfies that burden, then "the government shall bear the burden of persuasion on any element of the claim, *except* that the plaintiff shall bear the burden of persuasion on whether the . . . government practice that is

challenged by the claim substantially burdens the plaintiff's exercise of religion." *Id.* (Emphasis added.)

### iii. Applicable Legal Standard

Because RLUIPA mandates stricter scrutiny of government actions that burden inmates' religious freedoms than is required under the Free Exercise Clause, as applied by the Supreme Court in *Turner*, the court will first analyze Plaintiff's claims under the RLUIPA framework.[5]  If it finds the evidence here fails to support a claim under RLUIPA's strict scrutiny standard the court will forgo analysis under the less rigorous *Turner* framework.

### B. Plaintiff's Prima Facie Evidence

Under the RLUIPA framework Plaintiff bears the initial burden on summary judgment of presenting prima facie evidence of a Free Exercise Clause violation.  To do so, Plaintiff must first show that Defendants' actions "substantially burdened" his "sincerely-held religious beliefs." *Boles,* 486 F.3d at 1182. (10th Cir.2007).  In other words, Plaintiff must show that "[his] beliefs are religious in nature, and [that] those religious beliefs are sincerely held." *Snyder v. Murray City*

---

[5]  Plaintiff has not presented any evidence showing that the institution where he is confined receives Federal financial assistance.  However, because Defendants do not dispute this point, for present purposes the court will assume that the requirement is satisfied.  If necessary, Defendants may still challenge this point at a later time.

*Corp.,* 124 F.3d 1349, 1352 (10th Cir. 1997). The Tenth Circuit has held, however, that "[t]he inquiry into the sincerity of a free-exercise plaintiff's religious beliefs is almost exclusively a credibility assessment, [which] can rarely be determined on summary judgment." *Id*. at 1352-53. Thus, the court will set aside the question whether Plaintiff's beliefs are sincerely held and instead focus on whether the rights asserted by Plaintiff are religious in nature and whether they were substantially burdened by Defendants' actions.

### i. Religious Nature

The court finds no evidence to support Plaintiff's contention that his conflicts with SOTP personnel or the Parole Board were religious in nature. Plaintiff has not presented any evidence showing that the SOTP curriculum or methods have any religious connotations or burdened Plaintiff's religion in any way. For instance, Plaintiff has not shown that participation in SOTP required him to take any religious oath or to affirm any beliefs that are even remotely religious, let alone contrary to his own. Moreover, there is no proof that Plaintiff ever withdrew or was terminated from SOTP due to any religious conflict, instead, the evidence clearly shows that Plaintiff was discharged from SOTP based solely on his poor attitude and performance.

Plaintiff's own statements and actions strongly refute his contention that participation in SOTP violated his religious beliefs. During his Parole Rehearing Plaintiff admitted that SOTP was non-religious but stated that he wanted to participate in a faith-based program instead. Plaintiff's preference for a faith-based program, however, does not amount to a religious conflict. Moreover, after failing to find a suitable faith-based program Plaintiff voluntarily reentered SOTP in 2008, which Plaintiff repeatedly stated he would not do if he thought it would require him to compromise his religious beliefs. Finally, during the Parole Rehearing Gallegos made no effort to force Plaintiff into SOTP, instead, Gallegos merely noted Plaintiff's concerns and desire to find a faith-based program. Although Gallegos also explained that failure to complete SOTP or a suitable alternative might negatively impact Plaintiff's chances for parole, Gallegos did not say that it would entirely foreclose the possibility.

Thus, the Court finds no evidence to support Plaintiff's contention that his problems with SOTP or the Parole Board were religions in nature. Instead, as noted in the 2008 SOTP Discharge Summary, Plaintiff's actual problem with SOTP appears to have been his refusal to participate fully and his resort to "numerous tactics . . . to avoid working on preventing future

sexual offenses."  (*Martinez* Rpt. Ex. 2)

## ii. Substantial Burden

Even assuming that Plaintiff's problems with SOTP and the
Board had a religious component, the evidence here does not
support the conclusion that Defendants substantially burdened
Plaintiff's religious practice, either by removing Plaintiff from
SOTP or by denying him parole.

Turning first to Plaintiff's claim regarding SOTP, there is
no evidence that Plaintiff was treated differently because of his
religions convictions.  Plaintiff's contention that Green
violated his rights by requiring him to formulate a
rehabilitation plan which did not include his plans for the
ministry is entirely meritless.  Plaintiff admits that Green told
him he was free to pursue a religious ministry after release but
that his Relapse Prevention Plan should identify a secular
occupation.  Plaintiff has never contended that merely planning
for a secular occupation would violate his religious beliefs.  In
fact, in his letters to the Board requesting early release
Plaintiff stated that he intended to pursue employment as a long-
haul truck driver.  Finally, given the nature of Plaintiff's
crimes and his high risk of recidivism, Green clearly had valid
therapeutic reasons for requiring Plaintiff to develop
alternative employment plans besides a religious ministry.  Green

17

had ample reason to believe that Plaintiff's ministry plan would bring him into close contact with children and place him in a position of trust, which would increase Plaintiff's likelihood of re-offending. While Green's scepticism may have hurt Plaintiff's feelings it did not interfere with his religious beliefs or practices in any way.

The evidence also does not support a finding that Gallegos or the Parole Board substantially burdened Plaintiff's religion. Gallegos' discussion of Plaintiff's problems in SOTP and plans following parole did not impose a substantial burden on Plaintiff's religious beliefs. In fact, Gallegos never questioned Plaintiff about his specific religious beliefs or convictions, nor did he voice any disapproval concerning them. Moreover, the record shows that Plaintiff voluntarily raised the issue of religion on his own, both in his letters to the Board and during his hearing, and that Gallegos' questions and comments about religion were merely intended to clarify Plaintiff's statements and position. If Plaintiff felt uncomfortable discussing his religion or beliefs he should not have brought them up before the Board.

There is also no evidence that Gallegos' recommendation or the Board's decisions were influenced by religious considerations. While Gallegos' statements, taken out of

context, might suggest that Plaintiff's chances for parole were negatively impacted by his religious beliefs, that clearly was not the case. Instead, the transcript shows that it was Plaintiff's failure to complete SOTP, which had nothing to do with his religion, that Gallegos was concerned would influence the Board's decision. (*Martinez* Rpt. Ex. 7.) Moreover, there is no evidence that Gallegos ever reported anything to the Board regarding Plaintiff's religion or his beliefs. Finally, the record shows that the Board considered a variety of materials besides Gallegos' recommendation and that there was ample evidence to support its decision. (*Martinez* Rpt. Ex. 9-12.)

Thus, the court concludes that the record here does not support a finding that Defendants substantially burdened Plaintiff's religious beliefs or practices. Given this failure, the court further concludes that Plaintiff has not met his burden on summary judgment of presenting prima facie evidence of a Free Exercise violation, as required to support a claim under RLUIPA.

### C. Strict Scrutiny Analysis

Even assuming that Plaintiff could make out a prima facie case on the facts presented here, Defendants' actions were justified as the "least restrictive means" of achieving a "compelling governmental interest." Defendants clearly have a compelling interest in reducing the likelihood of recidivism by

convicted sex offenders.  And, the Parole Board has determined
that paroling offenders under strict supervision, including
employment restrictions, and requiring inmates to complete SOTP
prior to release, are essential means of accomplishing this
objective.  Plaintiff does not dispute that these techniques are
necessary to the Board's compelling objective, nor has he
presented any evidence showing that less restrictive means of
accomplishing the objective are available.  In fact, it is hard
for the court to imagine a less intrusive means of achieving this
objective than simply requiring a sex offender seeking early
release to formulate an employment plan that does not involve
close contact with groups he has previously victimized, or
inquiring during parole hearings about his plans following
release.  Finally, it is well settled that corrections officials,
including parole boards, are entitled to considerable deference
in areas of offender management and rehabilitation.  *See Turner*,
482 U.S. 90, 107 S. Ct. 2254; *Peltier v. Booker*, 348 F.3d 888,
892 (10th Cir. 2003).

Thus, the court concludes that even if Plaintiff could show
a substantial burden on his religious beliefs, he cannot not make
out a claim under RLUIPA because Defendants' actions were the
lest restrictive means of a achieving a compelling governmental
interest.

**ORDER**

Based on the foregoing analysis, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Dkt. no. 80) is

**GRANTED;**

(2) Plaintiff's Motion for Summary Judgment (Dkt. no. 67) is

**DENIED;** and,

(3) this case is **CLOSED.**

        BY THE COURT:

                DATED this 16th day of September, 2010.

        _____
        Ted Stewart
        United States District Judge